## Capital Amusement Company v. Board of Common Council of the City of Frankfort.

(Decided October 16, 1925.)

### Appeal from Franklin Circuit Court.

1. Municipal Corporations—Lease of Public Building May be Set Aside by Court for Fraud.—Leasing by city of public building, being the exercise of a proprietary power or municipal function as distinguishhed from a purely governmental function, may be scrutinized by courts and set aside if there was fraud in its making.

2. Municipal Corporations—Lease Held Procured Through Fraud.— Where renewal of a lease of municipal building was procured 20 months prior to its expiration without cause, through defendant's influence with councilmen who acted for him in having renewal passed, without any public advertising or bidding, which if made would have netted the city substantial addditional rent, such combined circumstances held to show lease was procured through fraud.

3. Estoppel—Estoppel Cannot be Set up by a Party whose Position has Not Been Changed and who Acted Fraudulently.—Where defendant secured the renewal of a lease from city by fraud, he can-

not set up an estoppel on city to cancel the lease by acceptance of rent, where record does not show he has changed his position, and since estoppel cannot be set up by a party who acted fraudulently.

LESLIE W. MORRIS for appellant.

JAMES H. POLSGROVE and MORRIS & JONES for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

By this action, appellee seeks to cancel a lease on that portion of its municipal building known as the Opera House made on behalf of the city of Frankfort in June, 1922, by the predecessors in office to the present board of councilmen with the appellant, the Capital Amusement Company. The lower court granted the appellee the relief it sought, and from that judgment this appeal is prosecuted.

From the evidence, it appears that in 1915, this Opera House was leased to one Fred Dolle. for picture show purposes at an annual rental of $2,450.00, the lease expiring in 1919. Before its expiration he assigned this lease to D. D. Smith, the present mayor of Frankfort, the council at that time extending the lease so as to make it expire in March, 1924, and also reducing the rent to $2,000.00 a year. By mesne assignments, this lease came. into the ownership of appellant, and it was under this lease that appellant was conducting its picture shows in the Opera House in June, 1922.

Just why appellant thought it necessary to secure a renewal of its lease at this time is not satisfactorily explained in this record. It is true appellant says that it deemed such renewal then necessary in order that it might place certain improvements on the property, and that it might make its contracts for future showings of films. But the character of the improvements appellant did put on the place after the renewal of the lease in June, 1922, was more in the nature of repairs, the need or extent of which is not shown to have been so imperative as to require so early a renewal of the lease, and the contracts appellant made for films do not disclose the necessity of making them much over six months in advance of their showing. The true explanation is probably disclosed in the testimony of John Joe Glenn, a member of the board of councilmen in 1922, who says that appellant's agent, Mr. Parsons, who negotiated the renewal of the

lease here in question, told him, in soliciting his support for the new lease, that the reason appellant wanted the renewal "was because it was a money making proposition. They (appellant) had taken it (the Opera House) over when it wasn't paying; they were making it pay and they could make it pay for five years, and *if other people knew they could build it up to a paying proposition, they would be after it.*" The latter part of this statement of Parsons to Glenn should have acted as a caution signal to this councilman, but he seems to have paid no attention to it.

The board of councilmen at this time was divided into various committees to which was referred for investigation, report and recommendation, such business as engaged the attention of the council. Of such committees, the one to which was referred the affairs of the Opera House was known as the hall committee. The chairman of this committee was Ike Kennedy, who was, as he says, "Pretty good pals (with Parsons); I worked for him on the door at the Opera House." Acting with and through his friend, Kennedy, Parsons undertook in June, 1922, to get appellant's lease extended for five years from the date of its expiration in March, 1924. Parsons was on excellent terms with most of the members of the general council and he undoubtedly represented to them that if they would extend the lease as he proposed he would have a position in Frankfort for the next five years to come. It is equally true that this was a determining factor in the action the council later took in renewing the lease. After Parsons had interviewed a number of councilmen and felt reasonably sure of his position, he had introduced in the council in June, 1922, through Kennedy, his friend and appellant's employe, a proposal to renew the existent lease for five years from the date of its expiration, but at an increased rental of $400.00 per year. This matter was referred to the hall committee, composed of Kennedy, Gordon Triplett and Mrs. Stuart. Mrs. Stuart did not testify in this case, but Triplett says that he was approached by Kennedy, who told him that "Parsons was a friend of ours" and that the lease was all right, and so relying on Kennedy's statements he concurred in a favorable report to the council. Kennedy made no effort to get any other bids, and it is apparent supported appellant's proposal solely on account of his friendship for Parsons. When the matter was reported to the council, the town clerk, as he testifies,

called the council's attention to the fact that "there had been others in the office inquiring about the expiration of the present lease, and stating . . . that they had a desire to bid on the lease to the Opera House when it expired." This statement of the clerk, which substantiates what Joe Glenn says Parsons told him as above noted, fell on deaf ears, for while not denying that the clerk made such statement no one seems to have paid any attention to it. A number of the council were laboring under the impression that the old lease was about to expire. Some had the idea that there had been competition in the bidding for the lease and that the proposition of appellant was the best bid. One member, Mrs. Baker, says that the proposal of appellant was represented to her as the best offer they had. To like effect is the testimony of A. L. Gordon. The hall committee, in reality Kennedy, as the other members left the whole matter to him, did nothing to clear up this confusion of ideas, but just said in substance that the lease was all right, and so pushed it through out of friendship for Parsons. The council deferred to the report of the hall committee, really the report of Kennedy, "the pal of Parsons" and the employe of appellant. The lease being reported favorably, it was referred to the city attorney for his approval as to form. At the next meeting of the council, the city attorney having approved the form in the meantime, the council accepted the proposal of appellant and directed the mayor to execute the new lease, which he later did. All this was done without any advertising for bids or any publicity other than that occasioned by reason of the business being transacted in a public meeting of the council. It is indisputably shown that had there been a public letting at this time, the city could have secured as good a tenant as appellant and a rental of $3,000.00 a year instead of the $2,400.00 appellant offered and which was agreed to.

The term of office of the council which renewed appellant's lease expired with 1923. Due to some confusion occasioned by Frankfort's undertaking to change to the commission form of government, which change was set aside by this court in Goin v. Smith, et al., 202 Ky. 486, 260 S. W. 10, the new council did not take office until May, 1924. Soon after its induction into office, it voted to set aside the renewal of appellant's lease made in June, 1922, and this litigation resulted.

That the city of Frankfort in the leasing of its Opera House for public entertainments was exercising a private proprietary power or municipal function, as distinguished from a purely governmental function, is conceded by both parties to this litigation. Cf. 28 Cyc. 268, et seq. This being true, it follows that the courts may scrutinize the lease here in question, and if they find that there was fraud in its making they may set the same aside. In Dillon on Municipal Corporations, 5th edition, at section 778, we find the following applicable rule thus stated:

"While it is true that the legislative department of the state is sovereign, that in general the mere motives, aside from acts that induce its action, cannot be the subject of judicial investigation, that the council of a city in passing ordinances for some purposes, e. g., police regulations, exercises delegated legislative authority, and such ordinances have the force of law and cannot be attacked because of the motives inducing them, yet when the subject matter before the court is a contract relating to the property or affairs of a city, although it may have been entered into by ordinance, the council of the city in making it exercises discretionary rather than legislative power, and the motives and inducements of the votes for the passage of the ordinance making or authorizing the contract, and whether they are honest or corrupt, that is, fraudulent in fact and in effect, may be the subject of judicial investigation. Hence, the action of a municipal council in making or authorizing a contract may be attacked for actual fraud or corruption, including bribery and other corrupt and unlawful inducements. But to authorize the avoidance of a contract on the ground of fraud the fraud must be clearly proved. . . . But it is not necessary that the fraud should be proved by direct evidence, nor is it essential to show precisely how or when the fraud was concocted or what particular city officials were implicated. It is sufficient to show that the contract, with whomsoever made, must have been the result of fraud."

A similar statement of the rule in an earlier edition of Dillon was cited with approval in the case of Shinkle v. City of Covington, 83 Ky. 420, at page 427. To the same effect is McQuillin on Municipal Corporations, sections 703, 704; 19 R. C. L., p. 904; 28 Cyc., p. 375, et seq. Looking to the evidence in this case we find appellant

procuring a renewal of its lease some twenty months before its expiration.

While it is true that a council may, at least when dealing with the private proprietary affairs of the city, make a contract to begin *in futuro* and at a time when it is no longer in office (City of Biddeford v. Frederick Yates, 104 Me. 506; Cf. Gathright v. Byllesby & Co., 154 Ky. 106, 157 S. W. 45), yet such action on the part of a council, especially when the contract is to begin so long in the future and no satisfying explanation is offered for the need of such action so long in advance, is a potent circumstance to be taken into consideration in determining whether or not the contract is being fraudulently obtained. We further find Parsons acting for appellant in bespeaking the support of Councilman Glenn for the lease's renewal, telling the latter that the appellant wanted a renewal of the lease because if others found out about the money the appellant was making they would, too, be after the lease. The renewal then, was not sought because of any necessity on the part of the city either to procure a new tenant or retain an old tenant, or because of any business need of appellant other than the forestalling of competition. The very reason assigned by Parsons to Glenn for his request for renewal was the best reason the city could have had in pausing and going slow in the matter of such renewal. If others would be after the lease then the city would be benefited by the competition in the bidding for such lease. Yet we find that although Glenn was so warned it was he who later, when the council came to consider the report of the hall committee concerning the renewal of this lease, made the motion that the lease be renewed. It was Parson's friend and appellant's employe who, as chairman of the hall committee, reported favorably on appellant's application to renew the lease. That he did this out of friendship for Parsons is too clear to admit of contradiction. It may be true that Kennedy and the other active friends of Parsons in the council did not appreciate that they were abandoning their duty to the people and that they were not intentionally neglecting the proprieties of the occasion, but the fact remains that they went by all caution signals; that the warning of Parsons to Glenn and of the town clerk to the effect that others wished to bid on the renewal of the lease were ignored; and that although they thought the proposed renewal a fair one they were actuated in the main, as Parsons and appellant well knew,

out of friendship for Parsons and a desire to see him retained in Frankfort during the five years to come. Although it may be true that there was no legal requirement that the letting of this lease should have been advertised publicly, yet the fact that there was no such advertising and the fact that the public were not otherwise advised than by such publicity as attends the ordinary meetings of boards of councilmen, that a lease was about to be let is another factor to be considered in determining whether or not there was any fraud in the making of this lease. The renewal of this lease was being executed some twenty months in advance of its taking effect. The public did not have their attention particularly called to the fact that such action was about to be taken. The slightest reflection on the part of the council or the appellant would have convinced them that under such circumstances there could be no competition for such lease. Yet appellant was insisting and the council was willing to put through a lease without any investigation whether or not a better lease could be secured and at a time when it is shown that had the public been advised a better lease could have been secured. Appellant well knew this, since Parsons in effect so told Glenn. Of necessity, organized bodies of men must transact the major portion of their business through the committee system. No legislative body could function on any other basis. This being true it is peculiarly the duty of committees to make a full, frank, fair disclosure of all facts necessary for a proper consideration by the legislative body of such matters as may be referred to such committees. When Kennedy was asked by the other members of the council about this lease all he told them was that the lease was all right and Parsons was a good friend of theirs. At this time we find a part of the council laboring under the belief that the old lease was about to expire, and another part of the council laboring under the belief that there had been competition in the bidding and this was the best bid. Yet Kennedy, Parsons' friend and pal, and appellant's employe, and the chairman of the hall committee, does nothing to clear away this confusion, but out of friendship for Parsons undertakes to push the lease through the council. Thus, either through representation or suppression, whether the latter was intentional or not, and when it was his duty to lay all the facts before his fellow members of the council on their inquiry, Kennedy pushes, as he testified, this lease through the

council as Parsons' friend and pal, when had there been a competitive bidding or the facts fairly disclosed, the city could have obtained equally as good a tenant at an increased rent of $600.00 per year. No one thread of the tiny Lilliputians would have bound the giant Gulliver to the ground, but by their combined strength they held him helpless. So in this case the combined circumstances surrounding the procurement of this lease compel us to the conclusion that it was procured through what the law calls fraud.

Appellant, however, insists that having accepted the rent on the new lease since March, 1924, appellee is now estopped to question its validity. There is no proof in this record whatever that appellant has been caused to change its position by anything which appellee has done, and so the essential elements of an estoppel are missing.

Furthermore, appellant having participated in the fraud is in no position to rely on the equitable doctrine of estoppel. In 21 C. J., at page 1138, we find:

"As an estoppel *in pais* is never allowed to be used as an instrument of fraud, but only to prevent injustice, it is therefore essential that the party claiming the benefit of the estoppel should have proceeded in good faith. Conduct or representations induced by his own conduct or representations, especially when fraudulent, cannot furnish the basis of a claim for an estoppel. A party is not estopped by a contract which he is induced by the fraud of the other party to execute."

The lower court having correctly cancelled the lease of June, 1922, its judgment is therefore affirmed.