**E.M. BAILEY DISTRIBUTING COMPANY, INC., and Gary J. Williams, Movants,**

v.

**CONAGRA, INC., and The Lyon County Riverport Authority, Respondents.**

Supreme Court of Kentucky.

May 10, 1984.

Rehearing Denied Oct. 25, 1984.

Stephen E. Smith, Jr., McMurry & Livingston, Paducah, for movants.

Glycon L. Ovey, Jr., Eddyville, Lee H. Hamann, McGrath, North, O'Maley & Kratz, Omaha, Neb., for respondents.

WINTERSHEIMER, Justice.

This appeal challenges the validity of an operating agreement between Conagra, Inc., and the Lyon County Riverport Authority. The Bailey Company seeks to overturn a Court of Appeals decision which affirmed a summary judgment denying the complaint.

The principal issue is whether the operating agreement unlawfully grants to Conagra, Inc., a franchise or a privilege without complying with the requirements of advertisement and competitive bidding in Section 164 of the Kentucky Constitution.

Under the terms of the operating agreement dated July 16, 1980, the port authority leased to Conagra, Inc., grain loading facilities owned by the authority in Lyon County. The agreement was privately arranged and Bailey and Williams, who are competitors of Conagra, filed suit attacking

the agreement as having been improperly entered into.

The circuit court granted summary judgment to Conagra and the riverport authority and dismissed the suit. The Court of Appeals, in a 2–1 decision, affirmed the summary judgment. The riverport authority is a public body organized under the Riverport Authority Act, KRS 65.510. Bailey and Williams challenged the agreement as being invalid because it was privately executed between a public body and a private corporation without publication of the specifications and without advertisement or solicitation of competitive bids. The operating agreement entitled Conagra to various benefits including the exclusive use of the land adjacent to the riverport facility and the use of grain loading apparatus to the exclusion of all others upon a 24-hour prior notice. There is no limitation on this use, and presumably, Conagra, with notice, could use the facility 365 days per year. The agreement is for two years with an automatic renewal for three consecutive one-year periods.

The agreement requires the port authority to construct and install facilities and equipment based on specifications approved by Conagra. The port authority must keep the facility in good repair, and should it fail to do so, Conagra may make repairs and charge the authority. The authority must pay for utilities furnished to the grain loading facilities both for installation and for general use. The authority must also keep the channel providing access to the facility in safe and navigable condition. Conagra receives the benefits of the tax-exempt status of the property, and it may seek reimbursement from the authority for structural modifications and capital improvements. It may also demand that the authority install, maintain and improve railroad facilities. Conagra also has the exclusive right to use adjacent land for conducting its operations and locating its office. Bailey and Williams claim that the expenditures of the authority for this project will exceed $193,000.

In return for these benefits, the port authority receives a guaranteed annual rent depending upon the amount of grain handled by Conagra, and Conagra agrees to construct other facilities. The minimum annual rent is $10,000.

This Court reverses the decision of the Court of Appeals and the circuit court because the port authority is a public entity pursuant to statute and has violated Section 164 of the Kentucky Constitution by not advertising for competitive bids for the privileged use of the public facility.

■ Section 164 of the Kentucky Constitution provides that before granting a franchise or privilege for a term of years, a municipality shall first after due advertisement, receive bids publicly and award the same to the highest and best bidder. It is undisputed that the operating agreement was executed without the port authority having first advertised and solicited bids. Consequently, the agreement is null and void. *Jefferson County v. Jefferson County Fiscal Court*, 273 Ky. 674, 117 S.W.2d 918 (1938).

■ A franchise is generally defined as a right or privilege granted by a sovereign power, government or a governmental entity to a party to do some act which such party could not do without a grant from the government. *Mt. Vernon Tel. Co. v. City of Mt. Vernon*, 313 Ky. 93, 230 S.W.2d 451 (1950); *Inland Waterways Company v. City of Louisville*, 227 Ky. 376, 13 S.W.2d 283 (1929). A franchise is a grant of a right to use public property or at least the property over which the granting authority has control. *Young v. City of Morehead*, 314 Ky. 4, 233 S.W.2d 978 (1950).

One test for determining a franchise within the meaning of Section 164 of the Kentucky Constitution can be found in *Willis v. Boyd*, 224 Ky. 732, 7 S.W.2d 216 (1928), when the court said that a lease can grant a franchise because the lessee obtained a right or privilege not enjoyed by citizens in general. 36 Am.Jur.2d § 722, *Franchises*.

Here the record is clear that the operating agreement grants a right to Conagra to use public property over which the port authority has control and ownership because the agreement provides Conagra with a priority use of the grain-loading facilities that could become exclusive without any difficulty. Conagra has been granted a right to use property in a manner which is not enjoyed by the citizens in general. It can exclude other members of the general public by simply giving 24-hour notice. Obviously the public at large does not enjoy the same privilege. If a member of the general public prevented other citizens from using the port authority facility and asserted a right to priority, such a person would commit a trespass on public property.

*Inland Waterways, supra,* cited in support of respondents' position, is distinguishable from the facts in this case because it involved a lease by the City of Louisville of property held by it, but not being used for, wharf purposes. The lease granted only a temporary use of the property and the City could recover it at any time it was needed for wharf purposes. This Court held that the lease was not a franchise, noting that the recapture provisions in the lease were wholly incompatible with the idea of a fixed right for a definite term.

Here Conagra is permitted a fixed right to use the grain facilities as needed by it for a definite term of five years. The authority cannot regain the grain facility once Conagra has given the required notice and cannot in any event ever recapture the operational area adjacent thereto over which Conagra has been granted absolute exclusive control.

█ In considering this matter, it is useful to distinguish a franchise from a license. A license in respect to real property can be defined as a personal privilege to do acts upon the land of the licensor of a temporary nature which are revocable at the will of the licensor. A franchise is neither temporary or personal and it is not revocable at the will of the grantor. *See* 36 Am.Jur.2d § 2, *Franchises;* cf. *Owens-*

*boro v. Cumberland Tel. & Tel. Co.,* 230 U.S. 58, 33 S.Ct. 988, 57 L.Ed. 1389 (1913).

Certainly the use of this grain loading facility is a proper subject of a franchise agreement. Such privilege may be granted by the appropriate governmental authority by virtue of its control over waters, wharves and related activities. This brings it within the traditional concepts of a franchise for the use of public streets. Here the property in question was entirely funded by tax dollars. KRS 65.510 provides that a riverport authority is a public or governmental agency and exists solely for a public purpose. It enjoys tax-exempt status to the same extent as other property used for public purposes. All revenues from the authority shall be exempt from taxation. KRS 65.620. KRS 65.610 provides that the authority may contract with any person or governmental agency for the use of the riverport facilities, but such contract shall not prevent, restrict or hamper the general use of the riverport by the public.

A wharf has been variously defined as a structure to which vessels have access for the convenience of loading and unloading. It is a substantial and permanent structure which can be considered an extension of the shoreline. If the land on which it is constructed is vested in the public, or built by public authority on lands condemned, or if it is at the end of a public highway, it may be regarded as a public wharf or landing. The construction of docks and wharves and the operation of a port are clearly governmental functions for which public funds may be expended. Private persons other than riparian owners have no right to erect or maintain a wharf generally. 79 Am.Jur.2d, *Wharves,* §§ 1, 2, 3, 4.

█ For the purpose of encouraging commerce, the State may grant to private individuals or corporations, franchises or licenses to maintain and operate wharves, although this may result in conferring privileges and advantages which are wholly private and exclusive in their character. Ordinarily, a municipal corporation has no proprietary rights in its public wharves.

Whatever rights it has in them, it holds in trust for the public. A grant of power to erect a wharf must be regarded as a trust involving duties and obligations to the public. 79 Am.Jur.2d § 24; *Roberts v. Louisville*, 92 Ky. 95, 17 S.W. 216 (1891). In *Roberts*, the court said that looking to nature and purpose of such a special grant to erect a wharf that it must be regarded as a trust involving duties and obligations to the public. *Roberts* held that it was the plain legal duty of the municipal corporation to hold and control wharf property for the use of the public.

■ Section 164 of the Kentucky Constitution has existed since 1890, and although case law has diluted its effectiveness to some extent, the cases which limit the requirement for advertisement and competitive bidding should be interpreted on a very narrow basis. The purpose for Section 164 of the Kentucky Constitution is to prevent governmental agencies of any kind from giving away, or disposing of at inadequate prices, the rights and privileges which belong to its citizens and to compel the disposition of public property to be accomplished publicly and for the highest and best value. The riverport authority holds title to the land and improvements in an absolute trust for all the people of Lyon County. Such a public asset cannot be disposed of without the due advertising, competitive bidding and process mandated by the Kentucky Constitution § 164.

The Court of Appeals has given an overly broad interpretation to *Inland Waterways* by merely pointing to the distinction between that case and *Willis, supra. Willis* involved the taking of sand and gravel from under the Ohio River in McCracken County. The removal of such public property would clearly require a franchise. The riverfront property and *Inland Waterways* enjoyed riparian rights which would have been available to any owner of property abutting a river. The owner could use the surface of the water for any purpose including a wharf. No special grant or privilege would be required for a port if the property belonged to an individual. A permit might be required from an agency concerned with navigation or river traffic.

The requirement to sell to the highest and best responsible bidder does not prevent a government or public authority from excluding a particular bidder for good and valid reasons. The term "best" can be interpreted to include that the bidder must be responsible and have the apparent ability to carry out the terms of the agreement for the benefit of the public. A particular bidder involved in a riverport authority might be excluded if the acceptance of that bid would create or tend to create a monopoly or otherwise prevent the public from using the facility. *See Stites v. Norton*, 125 Ky. 672, 101 S.W. 1189 (1907).

Here the lease by a city of property held in proprietary capacity is not involved. The port authority was authorized and created by the General Assembly to establish a riverport and navigation facilities and to acquire and develop property pursuant thereto. The authority does not hold its property in a private capacity. The grain facility and the adjacent operational area are held in governmental capacity as a direct result of a specific legislative grant and the holding of such property and facility is one of the port authority's paramount duties as a governmental agency. It has no other purpose.

Certainly any private company can operate a grain-loading facility on a public water course subject to certain federal regulations which are not in issue here. In this case no private citizen or company can operate or use the grain-loading facility without the consent and express permission of the port authority. The privileges granted to Conagra under the operating agreement are rights which only come from the port authority. No company can obtain such a grant to use the port authority property without the permission of the agency. This privilege is not enjoyed by the citizens in general.

The obvious intent of the legislature in adopting the Riverport Authority Act was to promote and develop port facilities by a governmental agency for the use and bene-

fit of the general public. Here the power to determine who uses the facility under the operating agreement is vested solely in Conagra, and it may exclude the public from the use of such facilities at its own option. Such a broad delegation of authority to one company unduly restricts the right of the general public to use the facility.

Any review of the law of franchise or privilege in a given jurisdiction can be ascertained only by a patient and careful examination of the course of judicial decisions in the light of constitutional provisions and legislative enactments. Under the early English law, Blackstone defines a franchise as "a royal privilege or branch of the king's prerogative subsisting in the hands of a subject." 2 B.L. Commen. 37. Speaking for the United States Supreme Court, Mr. Justice Bradley observed that generalized and divested of the special form which it assumes under a monarchy based on feudal conditions, a franchise is a right, privilege or power of public concern, which ought not to be exercised by private individuals but should be reserved for public control either by the government directly or by public agents. Such rights and powers must exist under every form of society. *See California v. Central Pacific Railway Co.*, 127 U.S. 1, 8 S.Ct. 1073, 32 L.Ed. 150 (1888). In American law, a franchise is defined as a special privilege conferred by the government on individuals or corporations which does not belong to the citizens generally by a common right. The term "franchise" generally includes privilege. McQuillan, *Municipal Corporations*, 3d Ed., Volume 12, § 34.03 *Franchises*, p. 9.

*Board of Councilmen of City of Frankfort v. Pattie*, Ky., 227 Ky. 343, 12 S.W.2d 1108 (1928), involving the lease by a city of a theater property in which it was held that the lease arrangement was not a franchise, does not control this situation. In *Pattie*, the city advertised for and received sealed bids for the lease arrangement. This Court said a city has the same rights to control proprietary or private property owned by it so long as no fraud attaches to its contracts. *Pattie* also involved the limitation upon the term of the lease. Here there was no advertisement soliciting competitive bids or proposals and the term of the lease is not in issue. The property involved in this situation is controlled by the legislation authorizing riverport developments and directly involves the governmental responsibility and functions of the port authority.

It is interesting to note in the case of *Capital Amusement Company v. Board of Councilmen*, 210 Ky. 622, 276 S.W. 528 (1925), it was recommended that the municipality advertise for bids before entering into any contract for the leasing of the Frankfort opera house.

One of the common themes that runs through all the Kentucky decisions interpreting franchise and privilege matters as contrasted to proprietary functions indicates a strong concern by the court to prevent any fraudulent transactions. Another common thread in the Kentucky cases is that they are decided on a case-by-case approach, and are frequently ultimately determined on the basis of the particular facts in a given situation. The seeming preoccupation of the court with this type of case could easily be avoided by a strict adherence to the constitutional mandates set out in Section 164.

The Kentucky Model Procurement Code, KRS 45A, is not applicable to the riverport authority because neither the county, nor the authority, has adopted the provisions of the code required by KRS 45A.343. *See Ohio River Conversions v. City of Owensboro*, Ky.App., 663 S.W.2d 759 (1984).

In view of our decision it is unnecessary for us to consider the arguments relative to the alleged violations of Section 3, Section 171 and Section 179 of the Kentucky Constitution.

The decision of the Court of Appeals is reversed and the circuit court is directed to enter a judgment finding the operating agreement between Lyon County and Conagra, Inc., null and void because it is in violation of Section 164 of the Kentucky

Constitution requiring advertisement for the granting of a franchise or privilege.

STEPHENS, C.J., and LEIBSON and WINTERSHEIMER, JJ., concur.

VANCE, J., concurs in result.

GANT, J., dissents by separate opinion.

AKER and STEPHENSON, JJ., join in his dissent.

GANT, Justice, dissenting.

Although the majority opinion contains an excellent discourse on the general law of franchise, it does not answer the sole question raised by this appeal. That question is, "Does the grant of priority of use, a nonexclusive privilege, constitute the award of a franchise which requires the public bidding process mandated by Section 164 of the Kentucky Constitution?" We can quickly dispose of the grant of exclusive use of one small tract of land by ConAgra out of many acres. There is no allegation that this grant in any way interferes with the use of the port facilities nor is there any proof thereof.

Also, to place this action in proper perspective, several things should be pointed out. In answer to interrogatories, movants stated that they knew of not one single instance where the operating agreement interfered with any other person in the use of the Port facilities, nor any manner in which the agreement "inhibited river commerce" in any way. Neither movant alleges that he would have bid on the use of the Port facilities or that he was injured in any way, except as a taxpayer. Thus, unless the "Operating Agreement" itself creates a franchise, none exists. The mere possibility of future interference or inhibition is hardly enough.

Turning to the Operating Agreement entered into between the Port Authority of Lyon County, as it relates to the grain facilities, the use of those facilities is described in Article I, Section 1.1, as a "priority use." Section 1.2 specifically requires that the grain facilities and operational area shall be operated as a "*public* grain handling facility in receiving and storage of such products from any person, firm or corporation ...." Indeed, ConAgra conceded in oral argument that the facilities were available for public use. The "priority use" provision is also set out in Section 1.2 and requires three-day notice from ConAgra to the Port if such use is intended, where the three-day notice is possible, and 24-hour notice in all events. No time limit is set for the period that ConAgra will use the facilities, and, as stated herein, there is no proof that such use ever interfered with the public use of the facilities. The primary term of this agreement was two years from January 1, 1981, or final completion of the facilities, which had not been constructed at the time of the agreement, and the agreement contained three additional one-year extensions.

For the grant of this use, ConAgra committed itself to certain use of the facilities, fixed rates per bushel of grain, and a minimum annual rental. Other provisions of the contract are of no consequence to our decision.

By the terms of this agreement setting up a mere priority use and requiring that the facility shall be a public facility, for use by one and all, I cannot conceive that this could be deemed the grant of a franchise, especially in the absence of proof that anyone had ever been excluded from the facility for any period of time whatever. This may constitute a license, but it is not a franchise.

AKER and STEPHENSON, JJ., join in this dissent.