RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0158p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

NEW ALBANY MAIN STREET PROPERTIES, dba Port of
Louisville,

*Plaintiff-Appellee*,

*v.*

WATCO COMPANIES, LLC,

*Defendant*,

MARIA BOUVETTE,

*Defendant-Appellant*.

┐
│
│
│
│
│ No. 22-5351
│
│
│
│
┘

───────────────

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:20-cv-00343—Rebecca Grady Jennings, District Judge.

Argued:  June 14, 2023

Decided and Filed:  July 27, 2023

Before:  SUTTON, Chief Judge; LARSEN and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Amy D. Cubbage, TACHAU MEEK PLC, Louisville, Kentucky, for Appellant.  J. Kent Wicker, WICKER / BRAMMELL, Louisville, Kentucky, for Appellee.  **ON BRIEF:** Donald L. Cox, LYNCH, COX, GILMAN & GOODMAN, PSC, Louisville, Kentucky, for Appellant.  J. Kent Wicker, William H. Brammell, Jr., DRESSMAN BENZINGER LA VELLE PSC, Louisville, Kentucky, for Appellee.

—————————

**OPINION**

—————————

MURPHY, Circuit Judge.   It is well known that the U.S. Constitution incorporates the "sovereign immunity" from private lawsuits that the states possessed before the founding.  This *federal* constitutional immunity covers claims filed against the states in federal court, *see Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 57–73 (1996), claims filed against them in their own courts under federal law, *see Alden v. Maine*, 527 U.S. 706, 730–54 (1999), and claims filed against them in another state's courts, *see Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1493–99 (2019).

But a state's sovereign immunity does not end with the federal Constitution.  When a plaintiff pursues *state* claims against state defendants, these defendants may also invoke the state's own common-law or constitutional rules of sovereign immunity.  In this case, we must consider Kentucky's sovereign-immunity law, which grants "pure" immunity to some state actors and "governmental" immunity to others.  To help develop ports, Kentucky gives its localities the power to create riverport authorities.  The plaintiff in this case brought state claims against a riverport authority's executive director.  The district court held that Kentucky would not grant sovereign immunity to this director when sued in her official capacity.  We reverse because she is entitled to Kentucky's "governmental" form of sovereign immunity.

I

A

The term "port" comes from the Latin word "porta," which means "gate or gateway." Marvin L. Fair, *Port Authorities in the United States*, 26 L. & Contemp. Probs. 703, 703 (1961). Ports thus have long been described as the "gates of the realm" or the "gateways to commerce" because they allow ships to load and unload large amounts of foreign and domestic goods intended for sale at their final destinations.  *Id.*; 1 William Blackstone, *Commentaries on the Laws of England* 264 (1765).  Although public port authorities have long existed outside the United States, private parties (especially railroads) constructed most port facilities in this country

during the 1800s.  *See* Fair, *supra*, at 704–05; Hermann P. Bretsch, *Institutional Aspects of Port Development in Mid-America*, 19 Transp. Rsch. F. 481, 483 (1978); *cf. Comm'r of Internal Revenue v. Ten Eyck*, 76 F.2d 515, 518 (2d Cir. 1935).  Only a handful of public port authorities existed at that time, including those managing the San Francisco and New York docks.  *See* Fair, *supra*, at 705.

In America, the "modern port administration movement" instead developed in the early 1900s out of a concern that private interests had not sufficiently invested in America's public ports.  *Id.* at 705–06; *see, e.g.*, *Visina v. Freeman*, 89 N.W.2d 635, 643–44, 646–47 (Minn. 1958).  Reformers urged governments to assert ownership over privately constructed port facilities and to build new public terminals.  *See* Marc J. Hershman & Robin Scott Bittner, *Ports Over Time: Historical Perspectives on the Public Port*, in Urban Ports and Harbor Management: Responding to Change along U.S. Waterfronts 39–40 (Marc J. Hershman ed., 1988).  After World War I, Congress also expressed its "policy" to treat "water terminals" as "essential" and to incentivize cities with navigable waterways to make available "at least one public terminal" that all could use "on equal terms."  Rivers and Harbors Appropriation Act of 1919, Pub. L. No. 65-323, 40 Stat. 1275, 1286 (codified at 33 U.S.C. § 551).  Over the next few decades, many states began to authorize their localities to create public seaport and riverport authorities.  *See* Bretsch, *supra*, at 483.  By the end of the 1900s, public entities owned most general cargo port facilities, and about half of all "deep-draft marine berthing facilities."  Hershman & Bittner, *supra*, at 40.

Kentucky entered this field in 1964.  That year, its legislature passed the Riverport Authority Act to facilitate shipping and transportation along Kentucky's rivers.  1964 Ky. Acts 194, 194–200 (codified as amended at Ky. Rev. Stat. §§ 65.510 to 65.650).  This Act permits a city, a county, or both to create a "riverport authority" with the permission of Kentucky's Transportation Cabinet, a state-level agency.  Ky. Rev. Stat. § 65.520(1); *see id.* § 65.510(3).  The Act describes a riverport authority as a "body politic and corporate with the usual corporate attributes," including the ability to "sue and be sued," to enter contracts, to borrow money, and to acquire property.  *Id.* §§ 65.520(2), 65.530(4), 65.590.  A local government that creates a riverport authority gets to choose its "members" (who serve a term of years) and its "executive

director" (who serves at the local government's pleasure). *Id.* §§ 65.540(1), 65.570(4). This government also may use tax revenue to help the authority operate. *Id.* § 65.580.

At bottom, a riverport authority exists "to establish, maintain, operate, and expand necessary and proper riverport and river navigation facilities" and to develop the industrial property around these port facilities. *Id.* § 65.530(1). Once it constructs public port facilities, a riverport authority may "fix reasonable rates" for their use. *Id.* § 65.530(2). It may also contract with private parties to operate the facilities and with "commercial vendors" and "concessionaires" to provide services on the property. *Id.* §§ 65.530(3), 65.610(1). The authority must first reinvest any "surplus revenue" that these activities generate into maintaining the facilities. *Id.* § 65.610(2).

The Act makes clear that riverport authorities exist to perform a "public function" for a "public purpose" and "as a matter of public necessity[.]" *Id.* § 65.630. So it gives them several traditional government attributes. A riverport authority may acquire property through eminent domain if it obtains the consent of the government with jurisdiction over the property. *Id.* § 65.530(4)–(5). Like other government actors, a riverport authority may also issue "revenue bonds" to help pay for the large up-front costs of obtaining property. *Id.* § 65.600. And a riverport authority need not pay taxes on its property or its revenue. *Id.* § 65.620.

B

The Ohio River runs hundreds of miles from its source in western Pennsylvania to its mouth on the Mississippi River. The Ohio forms Kentucky's northern border. Each year, companies ship substantial cargo on the river. In 1965, the City of Louisville and Jefferson County sought to promote this commerce by jointly establishing the Louisville and Jefferson County Riverport Authority (which we will call the "Authority" for short). Appellant's Br. 7 n.3. When these two governments later merged into the Louisville and Jefferson County Metropolitan Government (or "Louisville Metro"), it became the Authority's "adoptive parent." *New Albany Main St. Props. v. Watco Cos.*, 2022 WL 901504, at *3 (E.D. Ky. Mar. 28, 2022); *see* Ky. Rev. Stat. § 65.550(1). The Authority constructed and owns a 300-acre port facility in

Louisville at which shippers can load and unload much of the cargo hauled along the Ohio River. Compl., R.1, PageID 2–3.

In 2009, following a public bidding process, the Authority leased its port facility to New Albany Main Street Properties, which does business as "Port of Louisville." *Id.*, PageID 3. In August 2016, the parties modified their lease agreement. *Id.*, PageID 4. This amended lease had the potential to last for nearly 20 years until 2035. *Id.* Through 2018, Port of Louisville alleges that the Authority never complained about its performance operating the port facility. *Id.*

In late 2018, however, Maria Bouvette, the Authority's executive director at the time, allegedly started secret negotiations to replace Port of Louisville with a competitor, Watco Companies, LLC. *Id.* By February 2019, the Authority had entered into a "Memorandum of Understanding" with Watco to operate the facility. *Id.*

But these parties faced a problem: the Authority's lease agreement with Port of Louisville remained in effect. According to Port of Louisville, Director Bouvette and Watco needed to find a pretextual reason to terminate this agreement. *Id.*, PageID 5. Coordinating with Watco, the Authority hired outside advisors to inspect the port facility. *Id.* These allegedly biased advisors found the facility "mismanaged, unsafe, and in disrepair." *Id.*

In mid-2019, the Authority formally asserted that Port of Louisville had breached the lease agreement. *Id.*, PageID 6. It filed several suits against Port of Louisville to remove it from the port facility. *Id.* Around the same time, Port of Louisville alleges, the Authority ran a public bidding process to find a replacement. *Id.*, PageID 7. The Authority awarded a lease to Watco contingent on Port of Louisville's successful removal from the site. *Id.*

One of the Authority's suits against Port of Louisville eventually made its way to arbitration. *Id.* The arbitrator ruled for Port of Louisville, upending the Authority's plans. *Id.* He held that Port of Louisville had an enforceable agreement with the Authority and that it had not materially breached this agreement. *Id.* The Kentucky courts rejected the Authority's challenges to this arbitration decision. *See Louisville & Jefferson Cnty. Riverport Auth. v. New Albany Main St. Props., LLC*, 2022 WL 496003, at *6 (Ky. Ct. App. Feb. 18, 2022).

The arbitrator continues to oversee Port of Louisville's counterclaims against the Authority. Compl., R.1, PageID 7.

This case, though, does not involve Port of Louisville's claims against the Authority. Rather, Port of Louisville separately sued Watco and Director Bouvette. The company alleged that these defendants had harmed its relationships with its customers when they were pressuring it to vacate the port facility. *Id.*, PageID 8–9. As one example, Port of Louisville has a contract to regularly load a customer's steel scrap at the port facility and to ship it upstream. *Id.*, PageID 8. Watco and Bouvette allegedly renegotiated this contract without Port of Louisville's consent, in violation of the lease agreement. *Id.* As another example, Watco and Bouvette attempted to get Port of Louisville's customers to shift their business to Watco by convincing them that Port of Louisville had breached the lease agreement and would soon be evicted. *Id.*, PageID 9.

Port of Louisville sued Watco and Bouvette in federal court on the basis of diversity jurisdiction under 28 U.S.C. § 1332(a). *Id.*, PageID 2. The company alleged state claims of tortious interference with contractual and business relationships, civil conspiracy, and defamation. *Id.*, PageID 10–13. It sought both damages and an injunction. *Id.*, PageID 13–14.

Bouvette moved to dismiss Port of Louisville's complaint. She argued that she was immune from Port of Louisville's state claims under three state-law doctrines: sovereign immunity, governmental immunity, and immunity under Kentucky's Claims Against Local Governments Act. *See New Albany*, 2022 WL 901504, at *2. The district court disagreed. It held that the Authority (and so Bouvette) could not invoke Kentucky's sovereign immunity because of its status as a corporation, not a government. *Id.* The court next held that the Authority (and so Bouvette) could not seek governmental immunity because it performed a proprietary (not a governmental) function. *Id.* at *3–4. The court lastly read the Claims Against Local Governments Act merely to codify the preexisting immunity principles that did not apply to Bouvette. *Id.* at *4.

## II. Appellate Jurisdiction

Bouvette immediately appealed the decision denying her claims to immunity. We typically have appellate jurisdiction only over the "final decisions" of district courts. 28 U.S.C.

§ 1291. This language ostensibly poses a problem for Bouvette because Port of Louisville's suit remains pending in the district court. The Supreme Court, however, has flexibly interpreted the word "final" in § 1291. *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 142–43 (1993). Under the "collateral order doctrine," a party may appeal an interlocutory order that conclusively resolves an issue if the issue is "collateral to" the main litigation and if the issue would be effectively unreviewable at the end of the case. *Id.* at 143–44 (citation omitted). The Court has long treated the denial of a government actor's request for *federal* sovereign immunity or qualified immunity as falling with this collateral-order doctrine. *See id.* at 147; *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). It has reasoned that these immunities provide a right not to participate in the suit at all, not just a defense against paying a money judgment. *See Mitchell*, 472 U.S. at 526–27. Practically speaking, then, defendants would forfeit the immunities if the defendants could not appeal a denial until after they litigated a case to completion. *See id.*

Here, by contrast, Bouvette immediately appealed a decision denying her claims to *state-law* immunities. Whether these immunities satisfy the Court's collateral-order doctrine raises a federal question about the meaning of § 1291. But that question turns on the nature of the immunities—a predicate state-law question. *See* 15A Charles A. Wright et al., *Federal Practice and Procedure* § 3914.10.9, at 878 (3d ed. 2022). Some immunities provide a broad right to avoid litigation altogether; others provide a narrow defense to monetary liability. The collateral-order doctrine permits the immediate appeal of defenses that fall within the first (but not the second) of these camps. *See Town of Smyrna v. Muni. Gas. Auth. of Ga.*, 723 F.3d 640, 645 (6th Cir. 2013); *see also Browning v. Edmonson County*, 18 F.4th 516, 529 (6th Cir. 2021).

How does this framework apply to the immunities that Bouvette seeks? Kentucky law leaves no doubt that sovereign and governmental immunity grant a right to state actors not to participate in a suit at all. *See Maggard v. Kinney*, 576 S.W.3d 559, 566 & n.8 (Ky. 2019) (collecting cases); *see also, e.g.*, *Breathitt Cnty. Bd. of Educ. v. Prater*, 292 S.W.3d 883, 886–87 (Ky. 2009). The Supreme Court's collateral-order doctrine thus gives us appellate jurisdiction over the district court's denial of these immunities. *See Mitchell*, 472 U.S. at 526–27.

Bouvette's defense under the Claims Against Local Governments Act is another matter. Some cases have assumed that this Act also grants the kind of immunity that permits an early appeal. *See Queen v. City of Bowling Green*, 956 F.3d 893, 899 (6th Cir. 2020). But others have read the Act—in particular, its text noting that a government shall not be "liable" except as the Act specifies, Ky. Rev. Stat. § 65.2003—to grant only a defense against a damages claim. *S. Woodford Water Dist. v. Byrd*, 352 S.W.3d 340, 343 (Ky. Ct. App. 2011), *overruled on other grounds by N. Ky. Water Dist. v. Carucci*, 600 S.W.3d 240, 241 (Ky. 2019); *see also N. Ky. Area Plan. Comm'n v. Jefferies*, 2016 WL 4490583, at *4 (Ky. Ct. App. Aug. 26, 2016). Under this view, the Act may not trigger the collateral-order doctrine. But we need not reconcile these cases here. All agree that we have jurisdiction over the district court's denial of Bouvette's requests for sovereign and governmental immunity. Reviewing the denial of those immunities de novo at this stage, *see Jackson v. City of Cleveland*, 64 F.4th 736, 743 (6th Cir. 2023), we conclude that she is entitled to governmental immunity. That holding eliminates any need to decide whether she can separately appeal the denial of her request for immunity under the Claims Against Local Governments Act.

### III.  Kentucky's Doctrine of Sovereign Immunity

#### A.  Background

Before the founding, it was a universally recognized attribute of a state's "sovereignty" that the state was not "amenable to the suit of an individual *without its consent*." *The Federalist* No. 81, at 486 (James Madison) (Clinton Rossiter ed., 1961). In recent decades, the Supreme Court has repeatedly held that our founders turned this common-law doctrine into a federal constitutional command when they enacted the U.S. Constitution. *See Hyatt*, 139 S. Ct. at 1493–96. The people quickly confirmed this reading too by amending the Constitution to overrule an early decision that had refused to grant immunity to a state. *See* U.S. Const. amend. XI (overruling *Chisholm v. Georgia*, 2 U.S. 419 (1793)). The Eleventh Amendment indicates that "one of the United States" (such as Kentucky) cannot be sued in federal court by "Citizens of another State" (such as Port of Louisville). *Id.* Some Justices have also suggested that, unlike the structural sovereign immunity that a state may waive, the Eleventh Amendment's language imposes a nonwaivable limit on a federal court's jurisdiction over suits that fall within its text.

*See PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2264–65 (2021) (Gorsuch, J., dissenting).

Yet Bouvette has not asserted any federal immunity or Eleventh Amendment defense here. That is perhaps because these federal doctrines typically cover only a state and its arms, not a county and its agencies. *See N. Ins. Co. of N.Y. v. Chatham County*, 547 U.S. 189, 193–94 (2006). Ultimately, though, we need not answer any *federal* immunity questions in this case, even if some impose absolute jurisdictional limits. Courts have "leeway" to choose among non-merits grounds for dismissing a suit. *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007). So we may resolve Bouvette's appeal solely on the basis of *state* sovereign immunity. When a case involves state (rather than federal) claims, Kentucky courts may grant broader sovereign-immunity protections to state officials than those officials would receive under the U.S. Constitution. *See Ferri v. Ackerman*, 444 U.S. 193, 198 (1979); *cf. Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 375–83 (1990). And a federal court sitting in diversity must respect these state immunities. *See Butler v. Gualtieri*, 41 F.4th 1329, 1336 (11th Cir. 2022); *PYCA Indus., Inc. v. Harrison Cnty. Waste Water Mgmt. Dist.*, 81 F.3d 1412, 1417–20 & n.4 (5th Cir. 1996).

In Kentucky, sovereign immunity has both common-law and constitutional dimensions. Start with Kentucky's common law. Kentucky courts originally granted sovereign immunity to the commonwealth by incorporating this "elementary principle" into its common law. *Zoeller v. State Bd. of Agric.*, 173 S.W. 1143, 1144 (Ky. 1915). For centuries, these courts have held that Kentucky has an "[a]bsolute immunity from suit" barring private parties from pursuing state claims against it. *Ky. State Park Comm'n v. Wilder*, 84 S.W.2d 38, 39 (Ky. 1935); *see Downing v. Mason County*, 8 S.W. 264, 265–66 (Ky. 1888); *Divine v. Harvie*, 23 Ky. 439, 441 (1828).

Turn to Kentucky's constitution. Nothing in this document directly incorporates the state's sovereign immunity. *See Yanero v. Davis*, 65 S.W.3d 510, 524 (Ky. 2001); *Ky. Ctr. for the Arts Corp. v. Berns*, 801 S.W.2d 327, 329 (Ky. 1990). But two provisions "indirectly" recognize the doctrine's existence. *Comair, Inc. v. Lexington-Fayette Urban Cnty. Airport Corp.*, 295 S.W.3d 91, 94 (Ky. 2009) (quoting *Wilder*, 84 S.W.2d at 39). The first bars Kentucky from spending money without its legislature's approval: "No money shall be drawn

from the State Treasury, except in pursuance of appropriations made by law[.]" Ky. Const. § 230. The second allows the legislature to permit suits against Kentucky: "The General Assembly may, by law, direct in what manner and in what courts suits may be brought against the Commonwealth." *Id.* § 231.

These two provisions have a narrow reach. They give Kentucky's legislature the power to *waive* sovereign immunity; they do not give it the power to *create* that immunity. *See Yanero*, 65 S.W.3d at 523–24; *Reyes v. Hardin County*, 55 S.W.3d 337, 338–39 (Ky. 2001); *Withers v. Univ. of Ky.*, 939 S.W.2d 340, 344 (Ky. 1997). In other words, although § 231 of Kentucky's constitution allows its *legislature* to decide when parties may sue the "Commonwealth," Kentucky's *courts* get to decide whether a suit against a particular actor triggers sovereign immunity because it qualifies as a suit against the "Commonwealth" within the meaning of § 231. *Withers*, 939 S.W.2d at 342–43. So the Kentucky legislature lacks free rein to grant sovereign immunity to entities that would not have received it under its common-law origins. *See Berns*, 801 S.W.2d at 329–30. Indeed, other constitutional provisions—for example, one that bars the legislature from limiting the amount that a plaintiff may recover for injuries, Ky. Const. § 54—restrict the legislature's power to enlarge immunity in this way. *See Yanero*, 65 S.W.3d at 525; *see also Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 797–802 (Ky. 2009).

Applying this mix of common-law and constitutional rules, a court considering whether a specific state actor should receive sovereign immunity under Kentucky law must proceed in two stages by asking two questions. First: Would sovereign immunity have covered this actor at common law? *See Yanero*, 65 S.W.3d at 523–24; *Berns*, 801 S.W.2d at 329. Second: If an actor is otherwise eligible, has the legislature passed a statute waiving this immunity? *Compare Univ. of Louisville v. Rothstein*, 532 S.W.3d 644, 647–48 (Ky. 2017), *with Furtula v. Univ. of Ky.*, 438 S.W.3d 303, 305–06 (Ky. 2014). If not, the entity should receive immunity. *See, e.g.*, *Jefferson Cnty. Pub. Schs. v. Tudor ex rel. J.T.*, 664 S.W.3d 600, 604 (Ky. 2023).

*Stage One*: A court must first ask whether a state actor is even eligible for the sovereign immunity that the legislature may waive. The answer turns on the background "common law" rules of immunity, presumably as they existed when Kentucky enacted its current constitution in

1891. *Yanero*, 65 S.W.3d at 523; *cf.* William Baude, *Sovereign Immunity and the Constitutional Text*, 103 Va. L. Rev. 1, 8 (2017). Over the years, the Kentucky Supreme Court has recognized that its cases applying these principles have not been a model of clarity or consistency. *See Bryant v. Louisville Metro Hous. Auth.*, 568 S.W.3d 839, 845 (Ky. 2019); *Yanero*, 65 S.W.3d at 521. Today, the court has settled on a test that divides sovereign immunity into two parts: "pure" immunity and "governmental" immunity. *Comair*, 295 S.W.3d at 94; *Bryant*, 568 S.W.3d at 845.

The "pure" version of sovereign immunity applies to a narrow set of state entities that qualify for immunity without the need to prove anything else. *Bryant*, 568 S.W.3d at 845. This version unsurprisingly covers Kentucky itself. *See id.* It also covers Kentucky's counties. *Downing*, 8 S.W. at 265; *see Yanero*, 65 S.W.3d at 526 (citing cases). And it covers employees of these two governments when sued "in their official capacities"—meaning that the funds from a money judgment will come from public coffers. *Schwindel v. Meade County*, 113 S.W.3d 159, 169 (Ky. 2003). This rule of pure immunity does not apply, by contrast, to most entities that these governments create, including state agencies. *See Bryant*, 568 S.W.3d at 845. It also does not apply to cities, which the Kentucky Supreme Court treats as "municipal corporations" rather than arms of the government. *Comair*, 295 S.W.3d at 95. And it does not apply to state or county employees sued in their "individual capacities." *Yanero*, 65 S.W.3d at 522. These employees must instead rely on the distinct doctrine of "qualified" immunity. *Id.*

The "governmental" version of sovereign immunity covers a broader set of entities. It can reach even "non-governmental or quasi-governmental bodies" (or their employees sued in their official capacities). *Howard v. Big Sandy Area Dev. Dist., Inc.*, 626 S.W.3d 466, 470 (Ky. 2020); *see Comair*, 295 S.W.3d at 103. Yet these entities must meet two additional requirements. *See Coppage Constr. Co. v. Sanitation Dist. No. 1*, 459 S.W.3d 855, 859 (Ky. 2015). An entity seeking governmental immunity must have been created by (and be under the control of) a government that itself qualifies for immunity—that is, the entity must have an immune "parent[.]" *See Howard*, 626 S.W.3d at 470. Dating back to the time of Kentucky's current constitution, Kentucky courts have also held that the entity must undertake "an 'integral' function of state government." *Id.*; *compare Williams v. Louisville Ind. Sch. of Reform*, 24 S.W.

1065, 1066 (Ky. 1894), *with Gross v. Ky. Bd. of Managers of World's Columbian Exposition*, 49 S.W. 458, 459 (Ky. 1899).

*Stage Two*: If an entity is eligible for sovereign immunity, a court must next ask whether the Kentucky legislature has waived this immunity. For years, the legislature enacted no generally applicable waivers. *See Reyes*, 55 S.W.3d at 339; Paul Oberst, *The Board of Claims Act of 1950*, 39 Ky. L.J. 35, 36 (1950). Each legislative session, the legislature would instead pass individual waivers on a plaintiff-by-plaintiff basis. *See, e.g.*, *Pennington's Adm'r v. Commonwealth*, 46 S.W.2d 1079, 1079–80 (Ky. 1932). Eventually, in the middle of the twentieth century, the legislature enacted the Board of Claims Act to "expressly" waive the state's immunity in several recurring circumstances. Ky. Rev. Stat. § 49.060; *id.* §§ 49.040, 49.070; *Reyes*, 55 S.W.3d at 339.

Except for the specifically identified waivers, however, this Act otherwise "preserve[d]" the state's immunity. Ky. Rev. Stat. § 49.060. Not only that, Kentucky's legislature later amended the Act to broadly suggest that private parties could not maintain an "action for damages" against Kentucky or "any of its cabinets, departments, bureaus, or *agencies* or any of its officers, agents, or *employees* while acting within their official capacity and scope of their employment[.]" *Id.* § 49.070(12) (emphases added). As written, then, the Act grants immunity not just to Kentucky itself but also to its "agencies" and "employees." *Id.* But this broad grant of immunity put the Act on a collision course with the Kentucky Supreme Court's repeated admonition that not all entities or employees with a connection to the state qualify for immunity as a common-law matter. *See Yanero*, 65 S.W.3d at 519–21. The court thus narrowly read the Act's broad ban on suits against state agencies or employees "as applying only to" the subset of agencies and employees that would receive immunity under the court's tests for "pure" and "governmental" immunity. *Id.* at 525; *see also Univ. of Louisville v. O'Bannon*, 770 S.W.2d 215, 217 (Ky. 1989).

## B. Application

These background principles clarify the nature of the parties' debate. To begin with, we need not consider the immunity inquiry's second stage. Port of Louisville does not argue that the

Kentucky legislature has passed a law that waives the sovereign immunity that would otherwise cover Bouvette if she were eligible for it. This case instead concerns only stage one: Port of Louisville argues that the common-law immunity rules do not reach its claims against Bouvette. We thus must consider whether Bouvette—in her capacity as the Authority's executive director—is entitled either to "pure" or to "governmental" sovereign immunity.

### 1. "Pure" Sovereign Immunity

Bouvette initially argues that she should receive immunity without having to establish any additional requirements under the "pure" form of sovereign immunity. *Comair*, 295 S.W.3d at 94. We can make short work of this claim. The Kentucky Supreme Court has held that this form of immunity applies only to suits against Kentucky and its counties (or the employees of these governments when sued in their official capacities). *See Bryant*, 568 S.W.3d at 845; *Yanero*, 65 S.W.3d at 526; *Downing*, 8 S.W. at 265. So a "state agency" like the Riverport Authority cannot receive this automatic immunity. *Bryant*, 568 S.W.3d at 845. That fact means that Bouvette cannot seek its protections either. *See Schwindel*, 113 S.W.3d at 169.

In response, Bouvette cites the subsections in the Board of Claims Act that ostensibly grant "sovereign immunity" to Kentucky's agencies and employees, including the agencies and employees of a consolidated local government like Louisville Metro. Ky. Rev. Stat. §§ 49.070(11)–(12); 67C.101(2)(e). By doing so, Bouvette mistakes the immunity inquiry's first stage for its second one. As we have explained, the Kentucky Supreme Court has interpreted these broad subsections to cover "only" those agencies and employees that received sovereign immunity under the common law. *Yanero*, 65 S.W.3d at 525; *see O'Bannon*, 770 S.W.2d at 217. The Board of Claims Act is thus beside the point now because Bouvette must first show her entitlement to common-law sovereign immunity (at stage one) before she can rely on the Kentucky legislature's refusal to waive the immunity (at stage two).

### 2. "Governmental" Sovereign Immunity

Bouvette is on stronger ground when she invokes the "governmental" version of sovereign immunity. This immunity can apply to a "corporate" "body" like the Authority if it can show two things. Ky. Rev. Stat. § 65.520(2); *see Comair*, 295 S.W.3d at 96, 99. The

Authority must have an immune "parent," and it must carry out an "integral" function of state government.  *See Howard*, 626 S.W.3d at 470.  As long as Port of Louisville has sued Bouvette in her official capacity, moreover, she can rely on this immunity too.  *See Comair*, 295 S.W.3d at 103.

a.  Is the Authority under the control of an immune "parent"?

The Authority may well meet the first of these two requirements.  To begin with, there is no dispute that it has an immune "adoptive parent": Louisville Metro.  *New Albany*, 2022 WL 901504, at *3; *see Comair*, 295 S.W.3d at 100.  The pure sovereign-immunity rules that protect counties also shield consolidated local governments.  *See Bryant*, 568 S.W.3d at 844 n.3.

Next, the Authority is under the substantial "control" of Louisville Metro and other governmental actors.  *See id.* at 846.  For example, Louisville Metro appoints the Authority's members and its executive director, and it may terminate the members for cause and the executive director at will.  *See* Ky. Rev. Stat. §§ 65.540(1), (3), 65.570(4); *Comair*, 95 S.W.3d at 100.  Louisville Metro next may audit the Authority's books at any time, and the Authority must provide a "detailed report" of its conduct to Louisville Metro each year.  *See* Ky. Rev. Stat. § 65.570(3); *Comair*, 295 S.W.3d at 100.  Apart from Louisville Metro's control, the Transportation Cabinet, a state-level agency, also must "provide oversight" of the Authority's "development activities[.]"  Ky. Rev. Stat. § 65.520(3).  In addition, Kentucky's constitution and its legislature impose further controls.  They require the Authority to follow a competitive bidding process when leasing its property to private parties and to ensure that these contracts do not hamper the public's access to its port.  *See E.M. Bailey Distr. Co. v. Conagra, Inc.*, 676 S.W.2d 770, 771–74 (Ky. 1984); Ky. Rev. Stat. § 65.610(1); *cf. Bryant*, 568 S.W.3d at 847.

In the end, though, we need not conclusively resolve this issue.  Port of Louisville expressly conceded that the Authority satisfies this first requirement.  Appellee's Br. 26.  So we may rely on its concession alone to find that Bouvette meets this first governmental-immunity factor.

b. Does the Authority perform an integral function of state government?

i. This case instead rests on the second governmental-immunity factor, which asks whether a corporate entity performs a "function integral to state government." *Comair*, 295 S.W.3d at 99 (quoting *Berns*, 801 S.W.2d at 332). To meet this test, an entity's "function" must possess two traits: it must be governmental (not proprietary) and it must be statewide (not regional). *See Bd. of Trs. of Ky. Sch. Bds. Ins. Trust v. Pope*, 528 S.W.3d 901, 909 (Ky. 2017). Kentucky courts have struggled to apply both elements of this "complex" test. *Bryant*, 568 S.W.3d at 848.

*First*, an entity's activities must qualify as "governmental" tasks typically performed by public entities rather than "proprietary" tasks typically performed by private businesses. *Bryant*, 568 S.W.3d at 847; *see Howard*, 626 S.W.3d at 472. When discussing this element, the Kentucky Supreme Court has sometimes suggested that it follows a *function-by-function* approach turning on the specific activity at issue—such that the same entity can be both immune (when performing a governmental function) and not immune (when performing a proprietary one). *See, e.g.*, *Grayson Cnty. Bd. of Educ. v. Casey*, 157 S.W.3d 201, 202–03 (Ky. 2005). More recently, however, the court has clarified that it follows an *entity-by-entity* approach that categorically grants (or denies) immunity based on "the sum of" an entity's "discrete functions," *Howard*, 626 S.W.3d at 472, or its "overall nature," *Comair*, 295 S.W.3d at 101. We will follow that latter path here.

Nevertheless, a fuzzy line divides government functions from proprietary ones because the government often performs tasks that private entities also undertake. Consider two examples. The Kentucky Supreme Court treats the provision of "education" as a paradigmatic government function. *Id.* at 99. But private entities have been educating this country's children for just as long as (if not longer than) their public counterparts. Conversely, the Kentucky Supreme Court treats the provision of water and sewage services as proprietary because private companies can supply them. *See N. Ky. Water Dist.*, 600 S.W.3d at 241, 244–45; *Coppage*, 459 S.W.3d at 862–64. But public entities have long provided these critical services too.

Why is one of these functions governmental and the other proprietary?  Does this divide turn on a *normative* judgment about what the government should do?  So a libertarian might believe that the test should cover only functions designed to protect against private force and fraud, whereas a socialist might believe that it should cover the operation of all the means of production.  Or does the divide turn on an *objective* judgment about what the government has traditionally done?  So the test should cover only functions performed by government from time immemorial but not functions that it has recently taken on.  *Cf. Caneyville*, 286 S.W.3d at 799.  Or should some other criterion help catalogue functions into government and proprietary buckets?  The existing caselaw offers little guidance on how to answer these basic questions, leading the Kentucky Supreme Court to caution that this part of its test does not facilitate "consistent results."  *Yanero*, 65 S.W.3d at 521.

*Second*, an entity must undertake a statewide—not a regional—function.  *Howard*, 626 S.W.3d at 471–74.  This element has proved equally troublesome because it does not require an entity to have statewide jurisdiction.  *See Bryant*, 568 S.W.3d at 850.  Rather, a local entity can satisfy the element if the "concern" that it seeks to address arises throughout Kentucky.  *See id.*  The need to alleviate poverty, for example, exists across the commonwealth.  *See id.*  So the Kentucky Supreme Court has held that a local housing authority supplying affordable housing to low-income individuals performed a statewide function even though it offered housing in just one county.  *See id.* at 844, 848–50.  At the same time, one would think that the need for adequate sewage services exists across Kentucky too.  But the Kentucky Supreme Court held that an entity supplying this service in just three counties met only "the needs of a discrete, localized geographic region."  *Coppage*, 459 S.W.3d at 864.  Because both concerns seemingly existed statewide, what factor or factors showed that one function served a statewide purpose while the other one served only a local one?  The existing caselaw again offers little guidance in how to answer this question.

The difficulty of both inquiries has led the Kentucky Supreme Court to fall back on a "case by case analysis" that considers the totality of the circumstances.  *Comair*, 295 S.W.3d at 99.  The test's fact-specific nature is shown by the divergent outcomes that it has produced.

On the one hand, the Kentucky Supreme Court has identified many functions as integral to state government. Because education counts, the court has often granted immunity to local school boards and state universities. *See Tudor*, 664 S.W.3d at 604; *Prater*, 292 S.W.3d at 887–88; *Autry v. W. Ky. Univ.*, 219 S.W.3d 713, 718 (Ky. 2007); *Yanero*, 65 S.W.3d at 527; *Withers*, 939 S.W.2d at 343–44. Unsurprisingly, the court has also held that "firefighting" qualifies as a statewide government function. *Caneyville*, 286 S.W.3d at 799, 804–05. Perhaps more surprisingly, it has held that entities that help the needy perform government functions even though private groups have long conducted this charitable work. As noted, the court granted immunity to a local housing authority that supplied affordable housing. *See Bryant*, 568 S.W.3d at 846–51. It also granted immunity to public defenders that served the indigent. *See Jacobi v. Holbert*, 553 S.W.3d 246, 255–56 (Ky. 2018). And it granted immunity to public institutions that helped the mentally ill and neglected children. *See Leavell v. W. Ky. Asylum for the Insane*, 91 S.W. 671, 671–72 (Ky. 1906); *Williams*, 24 S.W. at 1066. In addition, while private investment companies have long managed retirement accounts, the court held that a state retirement system performed a government function because it served only public employees. *Commonwealth v. Ky. Ret. Sys.*, 396 S.W.3d 833, 837 (Ky. 2013). Lastly, the court found that an entity that operated the "Kentucky State Fair" conducted a government function, even though many private entities hold fairs. *See Zoeller*, 173 S.W. at 1144–45.

On the other hand, the Kentucky Supreme Court has held that similar functions are not integral to state government. The court does not grant blanket immunity to all entities that serve those in need. It denied immunity to an entity whose responsibilities included providing homecare aides to the elderly, *see Howard*, 626 S.W.3d at 472–74, and one that treated substance abuse, *see Ky. River Foothills Dev. Council, Inc. v. Phirman*, 504 S.W.3d 11, 16–17 (Ky. 2016). Unlike local schools or fire departments, it also held that water and sanitation districts performed proprietary tasks. *See N. Ky. Water Dist.*, 600 S.W.3d at 241, 244–45; *Coppage*, 459 S.W.3d at 864. Similarly, unlike its grant of immunity to the retirement system that served only public employees, it denied immunity to an entity that provided insurance only to public schools. *Pope*, 528 S.W.3d at 908–09. And unlike its grant of immunity to the entity that ran the State Fair, it denied immunity to an entity that operated a Kentucky display at the World's Fair, *see Gross*,

49 S.W. at 458–59, and one that managed the Kentucky Center for the Arts, *Berns*, 801 S.W.2d at 330–31.

ii. How should this caselaw play out here?  Given the doctrine's fact-specific nature, the Kentucky Supreme Court would likely rely on the case with the most analogous facts.  And there can be no doubt which case that is: *Comair*.  There, the court addressed a public airport board that operated a Lexington airport.  *See* 295 S.W.3d at 93, 100.  After a terrible plane crash at this airport, the estates of deceased passengers sued the responsible airline, which, in turn, sued the airport board.  *Id.* at 93.  The Kentucky Supreme Court granted governmental immunity to this board.  *See id.* at 100–02.  The court reasoned that the board performed a function integral to state government by managing part of Kentucky's "transportation infrastructure": the airport.  *Id.* at 101.  The court viewed this duty as analogous to the duty to maintain public highways, which it regarded as a paradigmatic example of a government function.  *Id.*  To confirm its conclusion, the court added that the board, like other government actors, could issue revenue bonds and receive tax dollars.  *Id.* at 102.  And the board did not act with a profit motive because it could impose only "reasonable" fees for the use of its airport and must reinvest any profit into the airport.  *Id.*

The Riverport Authority in this case is like the airport board in *Comair* in every way that counts.  Most importantly, *Comair* holds that the development of "transportation infrastructure" qualifies as a government (not a proprietary) task.  *Id.*  This transportation infrastructure includes not just the airports that planes use or the roads that cars use but also the "docks and wharves" that ships use.  *E.M. Bailey*, 676 S.W.2d at 772.  Like an airport, a public port has often been compared to "a *public highway*."  Fair, *supra*, at 703; *cf. Comair*, 295 S.W.3d at 101.  So the Kentucky Supreme Court has already held that the "construction" and "operation of a port"—the Authority's primary responsibilities—qualify as "governmental functions" for purposes of another provision in Kentucky's constitution.  *E.M. Bailey*, 676 S.W.2d at 772; *see* Ky. Rev. Stat. § 65.530(1).

Many courts have reached similar conclusions in various contexts.  *See Visina*, 89 N.W.2d at 643–47 (collecting cases).  Courts have held that the taking of property to build a public port qualifies as a public use.  *See id.* at 645–46; 11 *McQuillin: The Law of Municipal*

*Corporations* § 32:79.1 (3d ed.), Westlaw (database updated June 2023). They have held that the expenditure of taxpayer dollars to construct a public port qualifies as a public purpose. *See, e.g.*, *Visina*, 89 N.W.2d at 643–47; *cf. Dysart v. City of St. Louis*, 11 S.W.2d 1045, 1049 (Mo. 1928). And they have held that the employees of public port authorities performed government functions under the now-defunct doctrine that treated such employees as immune from federal taxation. *See Ten Eyck*, 76 F.2d at 518–19; *but cf. Helvering v. Gerhardt*, 304 U.S. 405, 422–24 (1938). Dating back to England, these courts reasoned, the construction of ports fell within "the royal prerogative" and required government permission. *Ten Eyck*, 76 F.2d at 518; *see* Blackstone, *supra*, at 264. That is because the government owned the land underneath the navigable waters on which ports were (at least partially) built. *See Shively v. Bowlby*, 152 U.S. 1, 11–14 (1894). So it had the authority to preserve "the use of navigable waters from" interference by private ports and to develop a system of public "wharves, docks, and piers" to facilitate commerce. *Ill. Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 436, 452 (1892). In our country, this authority fell to the states, which took title to the lands underneath their navigable waters "in trust for the public." *Id.* at 455; *see Shively*, 152 U.S. at 14–31. Even when states allowed private interests like railroads to develop ports, they retained the ability "to regulate uses of these lands, in the public interest[.]" James A. Fawcett, *Port Governance and Privatization in the United States: Public Ownership and Private Operation*, in Devolution, Port Governance and Port Performance 211 (Mary R. Brooks & Kevin Cullinane eds., 2007).

Apart from the governmental nature of the Authority's main duty to develop a public port facility, the remaining factors on which *Comair* relied show that its holding extends to this case. Like the airport board, the Authority does not act with a "profit" motive. *See Comair*, 295 S.W.3d at 102; *see also Bryant*, 568 S.W.3d at 847–48; *Jacobi*, 553 S.W.3d at 255; *Autry*, 219 S.W.3d at 718. Rather, it may charge only "reasonable rates" for the use of its port facility and must devote any "surplus revenue" to maintaining the facility. Ky. Rev. Stat. §§ 65.530(2), 65.610(2); *Comair*, 295 S.W.3d at 102. And like the airport board, the Authority is eligible to rely on revenue bonds and taxpayer funds to subsidize its activities. Ky. Rev. Stat. §§ 65.580, 65.600; *Comair*, 295 S.W.3d at 102; *see also Jacobi*, 553 S.W.3d at 256; *Zoeller*, 173 S.W. at 1144–45.

Like the law governing the airport board, moreover, the Riverport Authority Act treats all of the activities that the Authority may undertake as "public" functions performed to meet a "public necessity[.]"  Ky. Rev. Stat. § 65.630; *see Comair*, 295 S.W.3d at 101.  Although the Kentucky Supreme Court has cautioned that a legislative declaration of a public purpose does not automatically compel a judicial determination of immunity, this type of legislative pronouncement equating an entity's duties with a "public necessity" at least "*informs*" our conclusion that the Authority performs an "integral" part of government.  *Bryant*, 568 S.W.3d at 848–50.

Lastly, the Authority performs a "statewide" function because it alleviates a statewide concern.  *See id.*  To be sure, the Authority has a limited jurisdiction near the Louisville area.  *See* Ky. Rev. Stat. §§ 65.510(6), 65.530(1).  But so did the local housing authority that the Kentucky Supreme Court found immune.  *See Bryant*, 568 S.W.3d at 850.  And the need to ensure that individuals living in, say, eastern Kentucky have adequate means to ship their cargo to the other side of the commonwealth represents a classic governmental problem that extends beyond any one region.  *See Comair*, 295 S.W.3d at 101.  If anything, a local entity that develops transportation infrastructure more directly serves all Kentuckians than does a local housing authority, which primarily meets the needs of only those who live in the locality.

Port of Louisville's responses do not change things.  Citing a state trial court's decision denying immunity to the Authority, Port of Louisville argues that the Authority merely engages in a "commercial shipping operation."  Appellee's Br. 28 (citation omitted).  But *Comair* rejected an identical claim.  It distinguished transportation *services* (which private airlines provide) from transportation *infrastructure* (which the airport board provided).  *See Comair*, 295 S.W.3d at 101–02.  Even if private airlines commonly sell trips to other destinations, the court reasoned, the development of the airport is a "quintessential state concern and function[.]"  *Id.* at 102.  The same logic applies here.  Like the airport board in *Comair*, the Authority does not own the ships that haul cargo; it owns the port facility (the transportation infrastructure) that these shippers use.

This reasoning also distinguishes the main case on which Port of Louisville relies: *Transit Authority of River City v. Bibelhauser*, 432 S.W.3d 171 (Ky. Ct. App. 2013).  Unlike the

Authority, the public entity in *Bibelhauser* provided the types of "transportation services" in the Louisville area that a taxi company or private bus line might sell. *Id.* at 174–75. Because this entity did not develop any "transportation infrastructure," the Kentucky court of appeals held that it performed a non-immune proprietary task. *Id.* at 175. The opposite is true for the Authority.

Port of Louisville next attempts to distinguish *Comair*. As far as the record showed in that case, the airport board operated the airport itself. 295 S.W.3d at 101. But the Authority has leased the port facility to a private party, so Port of Louisville says it merely acts as a "property developer and landlord[.]" Appellee's Br. 27, 30. We fail to see why this factual distinction matters. For starters, the Riverport Authority Act makes clear that any lease that a riverport authority enters "shall not prevent, restrict or hamper the general use of the riverport by the public." Ky. Rev. Stat. § 65.610(1). The Authority also does not act like any other Louisville property developer. *Cf. N. Ky. Area Plan. Comm'n v. Cloyd*, 332 S.W.3d 91, 96 (Ky. Ct. App. 2010) (citing *Comair*, 295 S.W.3d at 98–99). It enters into lease contracts to "establish, maintain, operate, and expand" riverport facilities. Ky. Rev. Stat. § 65.530(1). Just as the local housing authority in *Bryant* leased housing property for a public purpose (to help low-income individuals), *see* 568 S.W.3d at 848, so too the Authority leases industrial property for a "public purpose" (to develop ports), Ky. Rev. Stat. § 65.630. The "sum" of the Authority's "discrete functions" renders it immune because its main reason for being qualifies as a statewide government function. *Howard*, 626 S.W.3d at 472.

Even if the Authority performs a function that entitles it to governmental immunity, Port of Louisville lastly argues, Bouvette may not rely on that immunity here because it sued her in her personal capacity. We disagree. When a complaint is ambiguous over whether a plaintiff has sued state defendants in their personal or official capacities, we will construe it as raising official-capacity claims unless the "course of proceedings" has clarified that the plaintiff seeks to hold the defendants personally liable. *See Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) (en banc); *see also Moore v. Hiram Township*, 988 F.3d 353, 359 (6th Cir. 2021); *Vittetoe v. Blount County*, 861 F. App'x 843, 852 (6th Cir. 2021). Kentucky courts arguably follow rules more favorable to Port of Louisville. *See McCollum v. Garrett*, 880 S.W.2d 530, 533 (Ky. 1994). But Port of Louisville makes no claim that these state rules should apply in this

federal suit under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). We thus need not consider that issue.

Under this test, Port of Louisville has sued Bouvette in her official capacity. As an initial matter, Port of Louisville generically cites the entire complaint when it argues that it has sued Bouvette in her personal capacity. It identifies nothing specific that would have given her notice of this claim. But the complaint is, at best, ambiguous. It merely identifies Bouvette as "Executive Director of Louisville/Jefferson County Riverport Authority" and never alleges that it seeks money damages from her in her individual capacity. Compl., R.1, PageID 2; *cf. Shepherd v. Wellman*, 313 F.3d 963, 968 (6th Cir. 2002). Nor does Port of Louisville even attempt to argue that anything in the "course of proceedings" would have put Bouvette on notice that it sued her in her personal capacity. *Moore*, 272 F.3d at 772. Indeed, it did not even raise the argument that Bouvette, as an individual, cannot rely on governmental immunity until this appeal. It thus may have forfeited the argument. *Cf. Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011–12 (6th Cir. 2022). All of this said, we will leave it for the district court on remand to decide whether Port of Louisville may amend its complaint to add an individual-capacity claim. *Cf. Moore*, 272 F.3d at 774–75.

One final point. Port of Louisville did not just seek damages; it also sought an injunction. Compl., R.1, PageID 13. The Kentucky Supreme Court has suggested that sovereign and governmental immunity would not bar a plaintiff from seeking prospective injunctive relief against a state officer. *See Univ. of Ky. v. Moore*, 599 S.W.3d 798, 811 (Ky. 2019). But Port of Louisville did not rely on this remedy, so we need not decide whether Bouvette's immunity would cover it.

We reverse and remand for proceedings consistent with this opinion.